IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. SNYDER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JESSICA J. SNYDER, APPELLANT.

Filed April 29, 2025.    No. A-24-524.

Appeal from the District Court for Holt County: MARK D. KOZISEK, Judge. Affirmed.

Bradley A. Ewalt, of Ewalt Law Office, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and P. Christian Adamski for appellee.

MOORE, PIRTLE, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Jessica J. Snyder appeals from her conviction for terroristic threats. Snyder assigns error relating to jury instructions, prosecutorial misconduct, and ineffective assistance of trial counsel. For the reasons stated herein, we affirm.

## II. STATEMENT OF FACTS

### 1. BACKGROUND

Snyder's conviction arose out of threats to kill Ervin Mast to avoid Mast obtaining custody of their two minor children. Between September and October 2023, Snyder sent numerous text messages to Mast providing him a deadline of October 9 to reconcile with her. On October 8, Snyder called Mast and threatened to kill him. Mast contacted law enforcement the same day. During law enforcement's investigation, the investigator discovered that Snyder sent Snapchat

- 1 -

messages to one of her children alluding to the same deadline Snyder gave to Mast. Thereafter, the State charged Snyder with terroristic threats, a Class IIIA felony.

## 2. PRETRIAL MOTIONS

Prior to trial, as relevant to this appeal, Snyder filed a motion-in-limine requesting an order prohibiting the State from adducing evidence of a prior conviction in case No. CR 22-61 involving Snyder's behavior towards Mast and his children. During a hearing on the motion, the district court received a warrantless arrest affidavit involving the 2022 criminal incident and the warrantless arrest affidavit from the present case. The district court found that there was clear and convincing evidence that Snyder committed the acts shown in the probable cause affidavit in case No. CR 22-61 and stated that "[f]urther procedure regarding admission of 404 evidence and objections thereto discussed. Parties to present the Court with their limiting instruction to be given prior to introduction of the 404 evidence."

## 3. TRIAL

Trial was held over 2 days in May 2024. Testimony was adduced from Mast, Austin Mendoza, Snyder's son, and Investigator Steven Binkerd.

### (a) Mast's Testimony

Mast testified that he and Snyder met in 2020, began dating shortly after, and had two children together. After the parties' relationship ended, the parties' children lived with Snyder until the Department of Health and Human Services removed them from Snyder's care shortly before her arrest. Mast testified that on October 8, 2023, he received a phone call from Snyder stating "that she was going to kill me and [the father of one of Snyder's other children] and herself . . . and the reasons she was going to kill me and [the other individual was] so we don't get the kids." Additionally, Mast testified that between September 28 and October 8, 2023, he received numerous text messages from Snyder indicating a deadline of October 9, 2023. Mast testified, "I believe she wanted me to go back and date her again and act like nothing else happened." The text messages were offered and received into evidence without objection. One of the text messages from Snyder to Mast stated, "I pray for my kids. You should pray for your kids too. I am done fighting. I will never leave my kids in your care."

Mast testified that prior to Snyder's arrest, Snyder wanted to place their two children for adoption, but he refused. Mast believed that this led to Snyder's threat to kill him. Mast testified that he took the threats seriously and believed that Snyder meant "that she was going to come out and kill me so I don't get to see the kids anymore. Or the kids don't get to see me." Mast reported the threat to law enforcement on October 8, 2023. While speaking with Investigator Binkerd, Mast received a call from Snyder and Investigator Binkerd directed Mast to record the conversation. Mast also recorded a second phone call with Snyder that he subsequently provided to Investigator Binkerd. The recording was received into evidence without objection.

### (b) Mendoza's Testimony

Mendoza, Snyder's son, testified that in October 2023, shortly before Snyder's arrest, he received messages on Snapchat from Snyder on Mendoza's brother's Snapchat account. Mendoza

testified that he knew it was Snyder sending the messages because his brother "doesn't text like that," and the messages referred to Mendoza and his brothers as "you boys" which Snyder commonly used to talk about him and his brothers. The text messages, which were received into evidence over Snyder's foundation objections, included the following statements by Snyder:

- "You and your brothers are only hurting yourselves. It's going to end up costing a lot of people. But that's on you boys, not me."
- "But I'm ok with that because it's time for this to come to an end."
- "This miserable world isn't for any of you anyway"
- "I'm not sick, but I'll . . . go to hell if I'm going to keep playing this game. It's going to cost a lot of people in 3 weeks if you boys don't get it together."
- "Just understand that you're not getting [anymore] chances after the 2nd week. You have no idea what will happen, but I do." and
- "I'm actually sitting pretty good right now. I made some amends with some people and I'm ready to go anytime. It's going to be costly though. You boys have a good night."

Mendoza testified that he interpreted the messages to mean that "[Snyder] didn't want any of us to be alive anymore; like she'd hurt us or try to kill us."

### (c) Investigator Binkerd's Testimony

Investigator Binkerd testified that, on October 8, 2023, Mast reported that he had received a call from Snyder in which she threatened to kill him. Investigator Binkerd testified that "[a]s we were talking, [Snyder] was attempting to call him back, so I advised him to hang up the phone with me and call her back, but this time record the conversation." Investigator Binkerd received the recorded conversation from Mast that same day. Investigator Binkerd then contacted Snyder. During this contact, Snyder initially denied making any threats to Mast, but after being advised of the recorded conversation, Snyder "admitted that she had made those comments." According to Investigator Binkerd, when asked why she threatened to kill Mast, Snyder "said that she was trying to get him to stop drinking so much and spend more time with her children." Investigator Binkerd testified that Snyder told him, "Oh, . . . you know me. I wouldn't kill anyone and I will probably not kill myself." At that time, Investigator Binkerd determined that Snyder met the "EPC [Emergency Protective Custody] criteria as far as being a threat to herself or others; in this case to both. So we decided that we were going to EPC her." After being unable to locate an available bed for EPC, Investigator Binkerd arrested Snyder and transported her to Antelope County Jail "where she could be [more closely] monitored and they have facilities for that kind of situation." The following day, an available bed was located and Snyder was transported to a mental health facility.

### 4. JURY INSTRUCTION CONFERENCE AND CLOSING ARGUMENTS

Following the close of the evidence, the court held a jury instruction conference. Snyder's counsel objected to subparagraph 5 of instruction number 7 as it related to the definition of "threaten" but did not object to the remainder of the instructions. Snyder's counsel also indicated that counsel did not have any other proposed instructions to provide to the court.

During closing arguments, the State argued:

The elements of the offense of terroristic threats: That on or between September 28th, 2023[,] to October 9th, 2023 . . . October 8th, the testimony was that [there] was the phone call. . . that [Snyder]; do we have her identified for the record? . . . yes, we did that. Threatened to commit a crime of violence[?] Well, she threatened to kill [Mast]. Did she do that with the intent to terrorize [Mast] or in reckless disregard of the risk of causing such terror[?] Well, what other intent would there be? I asked him, Hey, do you think she was joking? Was this a funny thing that you guys did? Nope. Did he take it serious? What was the effect that it had on him? He did take it serious. He was afraid. He was terrified.

### 5. VERDICT AND SENTENCE

The jury convicted Snyder of terroristic threats and, thereafter, the district court sentenced her to 3 years' probation. Snyder appeals and is represented by new counsel.

## III. ASSIGNMENTS OF ERROR

Snyder assigns that (1) the district court failed to properly instruct the jury on the elements of terroristic threats, (2) the district court failed to give a proper limiting instruction regarding bad acts evidence, (3) the State committed prosecutorial misconduct during closing arguments, and (4) trial counsel was ineffective in failing to object to prior bad act evidence.

## IV. STANDARD OF REVIEW

Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision. *State v. Garcia*, 311 Neb. 648, 974 N.W.2d 305 (2022).

When a defendant has not preserved a claim of prosecutorial misconduct for direct appeal, we will review the record only for plain error. *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019). An appellate court may find plain error on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *Id*. Generally, we will find plain error only when a miscarriage of justice would otherwise occur. *Id.*

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *State v. Rezac*, 318 Neb. 352, 15 N.W.3d 705 (2025). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id*.

## V. ANALYSIS

### 1. JURY INSTRUCTIONS

Snyder first assigns that the district court failed to properly instruct the jury on the elements of terroristic threats. More specifically, she argues that the trial court "failed to define the

recklessness mens rea as set out in Neb. Rev. Stat. § 28-311.01(c) [(Reissue 2016)]. The jury instructions only included definitions of the "intent to terrorize" portion of the mens rea." Brief for appellant at 10. Snyder contends that the court's failure to define "reckless disregard" had the effect of "potentially confusing the jury and potentially causing issues with the First Amendment protections of speech." Brief for appellant at 11. Snyder also asserts that "without defining 'reckless disregard[,'] the Court also did not require the jury to unanimously decide under which theory they were finding [Snyder] guilty of the charge." Brief for appellant at 11-12.

Failure to object to a jury instruction after it has been submitted to counsel for review precludes raising an objection on appeal absent plain error indicative of a probable miscarriage of justice. *State v. Erpelding*, 292 Neb. 351, 874 N.W.2d 265 (2015). Here, Snyder objected to the court's proposed instruction defining the term "threaten" but did not otherwise object or provide proposed instructions, therefore our review is limited to plain error.

Plain error may be found on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *State v. Erpelding, supra*. Based on our plain error review, we find no prejudicial effect on a substantial right of Snyder in the court's failure to define the term "reckless disregard."

As relevant to this case, Snyder was charged with terroristic threats which is committed when a person "threatens to commit any crime of violence: (a) With the intent to terrorize another; . . . or (c) In reckless disregard of the risk of causing such terror . . . ." § 28-311.01(1). Thus, the statute defines terroristic threats as a single offense which may be committed different ways. A juror in this case could find, consistent with the evidence, that Snyder threatened to commit a crime of violence and that she did so either with the intent to terrorize the victim or in reckless disregard of causing such terror. Therefore, insofar as Snyder argues that the failure to define "reckless disregard" did not require the jury to unanimously decide under which theory they found her guilty, that argument is without merit. See *State v. Abejide*, 293 Neb. 687, 879 N.W.2d 684 (2016) (jury need not be unanimous in conclusion as to which of several consistent theories it believes resulted in violation).

As it relates to her argument that the court erred in failing to define "reckless disregard" in the jury instructions, as a general rule, where a trial court fails, after specific request by the defendant, to define a word which makes up an essential element of the crime charged, such failure is prejudicial error requiring reversal. *State v. Bridger*, 223 Neb. 250, 256, 388 N.W.2d 831, 835 (1986). But as we stated before, failure to object to a jury instruction after it has been submitted to counsel for review precludes an objection on appeal absent plain error indicative of a probable miscarriage of justice. *State v. Erpelding, supra*. Under the statute, the State was required to prove that Snyder had the intent to terrorize Mast or that she acted in reckless disregard of causing such terror. Accordingly, those terms are essential elements of the crime of terroristic threats as indicated by the statute. However, Snyder did not make a specific request for the court to instruct the jury on the definition of "reckless disregard" nor does the record indicate that Snyder provided proposed instructions to the court defining such terms.

As relevant to this assigned error, the court instructed the jury as follows:
INSTRUCTION NO. 6: ELEMENTS; EFFECT OF FINDINGS:
A. ELEMENTS: Regarding Terroristic Threats, the elements of the State's case are:
(a) That on and between September 28, 2023[,] to October 9, 2023;
(b) The defendant . . . Snyder:
1) threatened to commit a crime of violence;
a) with the intent to terrorize . . . Mast; or
b) in reckless disregard of the risk of causing such
terror; and
(c) That these events occurred in Holt County, Nebraska.
. . . .
INSTRUCTION NO. 7: DEFINITIONS AND PROPOSITIONS OF LAW:
A. Intent is an element of terroristic threats. In deciding whether the defendant acted with intent you should consider her words and acts and all of the surrounding circumstances.
B. An "intent to terrorize" is the intent to produce intense fear or anxiety in another.
C. A terroristic threat does not require that the recipient of the threat be actually terrorized nor does it require an intent to execute the threat made.
D. "Crime of violence". A "crime" is an act or omission for which one is subject to punishment by public authority and "violence" is the exertion of physical force so as to injure or abuse.
E. Suicide is not a crime in Nebraska.
F. To "threaten" means to convey or communicate a promise of punishment, reprisal, or other distress. A threat can be conveyed by written or oral communication, or by a physical act.
G. "On or about" means the State must establish that the offense charged occurred on or near the dates alleged. It is not necessary that the proof establish with certainty the exact dates of the alleged offense.

Here, the record establishes that the district court did not include a definition of "reckless disregard" in the jury instructions. However, a court need not define a matter of common understanding under the facts of the case. See *State v. Duncan*, 293 Neb. 359, 878 N.W.2d 363 (2016). See, also, *State v. Bridger*, 223 Neb. 250, 388 N.W.2d 831 (1986) (implying that trial court is not required to define terms if definition is not requested by defendant and term has such generally understood and accepted meaning such that no instruction is necessary). Therefore, the question here becomes whether the term "reckless disregard" has a generally understood and accepted meaning such that no instruction was necessary.

Neb. Jury Instructions Crim. 4.0E defines reckless as "[d]isregarding a substantial and unjustifiable risk that. . . in circumstances in which disregarding this risk was a gross deviation from what a reasonable, law-abiding person would have done." Merriam-Webster defines reckless as: "marked by lack of proper caution"; "careless of consequences"; and "[i]rresponsible." Neb. Rev. Stat. § 28-109 (Reissue 2016) defines recklessly as:

Recklessly shall mean acting with respect to a material element of an offense when any person disregards a substantial and unjustifiable risk that the material element exists or will result from his or her conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to the actor, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation;

As evidenced from the above-stated definitions, this is not a case where the court failed to instruct the jury on a legal concept with a particular meaning in the law. See *State v. Duncan, supra*. The term "reckless" has substantially the same general meaning in the law as it does in its common usage. At least one court has come to a similar conclusion. See *Viar v. State*, 269 Ark. 772, 773, 601 S.W.2d 579, 580 (Ark App. 1980) (holding that "[w]e believe an average individual or juror would ascribe substantially the same meaning for the word [recklessly] as contained in the statutory definition"). And as this court held in *State v. Davenport*, No. A-94-009, 1994 WL 642698, at *17 (Neb. App. Nov. 15, 1994) (not designated for permanent publication), "Our review of the jury instructions in this case reveals that the jury was properly instructed with regard to the crime of manslaughter. The absence of an instruction defining "recklessly" did not prejudice [the defendant]." Accordingly, under our plain error review, we find that Snyder suffered no prejudice as a result of the court's failure to define "reckless disregard" as it has a commonly understood meaning. While it would have been in order for the court to define "reckless disregard" in the jury instructions, we hold it was not reversible error for the court to fail to do so absent a request for such instruction. Therefore, this assignment of error fails.

### 2. LIMITING INSTRUCTION

Snyder next contends that the district court failed to give a limiting instruction on bad acts evidence under Neb. Rev. Stat. § 27-404 (Cum. Supp. 2024). Although Snyder references the bad acts evidence first discussed in her motion-in-limine, she asserts that the separate evidence and testimony presented by Mendoza regarding the Snapchat conversation between Mendoza and Snyder fell within the ambit of Rule 404 and required a limiting instruction.

In the absence of a request for a limiting instruction, there is no reversible error in a court's failure to give a limiting instruction. *State v. Valverde*, 286 Neb. 280, 835 N.W.2d 732 (2013). Further, the Nebraska Supreme Court held in *State v. Oldson*, 293 Neb. 718, 750-51, 884 N.W.2d 10, 41 (2016):

> While, normally, the better practice is for a trial court to instruct the jury regardless of request, so as to ensure the evidence is not used for an improper purpose, the majority view is that the court does not have a duty to present a limiting instruction to the jury sua sponte. We have thus said that the failure to provide limiting instructions absent a request is not reversible error. Indeed, it may at times be a tactical decision by defense counsel not to highlight, through a limiting instruction, the evidence itself or the fact that the jury could infer from the evidence anything other than its proper purpose.

Prior to trial, Snyder filed a motion-in-limine related to a prior conviction in another case, but did not file a motion as it related to the conversation between Snyder and Mendoza. In fact, prior to Mendoza's testimony, the following colloquy took place between Snyder's counsel and the court:

> [Snyder's counsel]: Judge, we don't dispute [Snyder] sent them and they were sent within the time period that's alleged in the information. So I don't think we have an objection to 404 evidence.
>
> THE COURT: Well, would you make an argument that -- Do you even make an argument that it is 404?
>
> [Snyder's counsel]: No.

During the trial, Snyder did not object to Mendoza's testimony on the grounds that it violated Rule 404. The only objection Snyder made to the Snapchat messages was a foundation objection. Snyder further did not request that the court provide a limiting instruction at the time the testimony was adduced or when the evidence was admitted. Accordingly, Snyder failed to preserve any alleged error as to the court's failure to provide a limiting instruction and it did not constitute plain error for the court's failure to provide one. This assignment of error fails.

### 3. PROSECUTORIAL MISCONDUCT

Snyder assigns that the State committed prosecutorial misconduct during closing arguments when the State argued a fact that was not presented as evidence during the trial. More specifically, Snyder argues that

> In his closing argument, the prosecutor stated in regard to Ervin Mast, the alleged victim in this trial: "Did he take it serious? What was the effect it had on him? He did take it serious. He was afraid. He was terrified." . . . The issue was that this was not in evidence.

Brief for appellant at 13.

In *State v. Howard*, 26 Neb. App. 628, 631-32, 921 N.W.2d 869, 874 (2018), this court stated that:

> In order to preserve, as a ground of appeal, an opponent's misconduct during closing argument, the aggrieved party must have objected to improper remarks no later than at the conclusion of the argument. . . . Likewise, when a party has knowledge during trial of irregularity or misconduct, the party must timely assert his or her right to a mistrial. . . . A party who fails to make a timely motion for mistrial based on prosecutorial misconduct waives the right to assert on appeal that the court erred in not declaring a mistrial due to such prosecutorial misconduct.

See, also, *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019) (party who fails to make timely motion for mistrial based on prosecutorial misconduct waives right to assert on appeal that court erred in not declaring mistrial due to such prosecutorial misconduct).

Here, Snyder did not object or make a timely motion for a mistrial based on the State's closing argument. Accordingly, Snyder's alleged error that the State committed prosecutorial misconduct was waived. Therefore, our review of this issue is confined to plain error review.

In assessing allegations of prosecutorial misconduct based on prosecutorial remarks, a court first determines whether the prosecutor's remarks were improper. *State v. Cooke*, 311 Neb. 511, 973 N.W.2d 658 (2022). Next, a reviewing court must determine the extent to which the improper remarks had a prejudicial effect on the defendant's right to a fair trial. *Id.*

Whether prosecutorial misconduct is prejudicial depends largely on the context of the trial as a whole. *State v. Mrza, supra.* In determining whether a prosecutor's improper conduct prejudiced the defendant's right to a fair trial, an appellate court considers the following factors: (1) the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence the jury; (2) whether the conduct or remarks were extensive or isolated; (3) whether defense counsel invited the remarks; (4) whether the court provided a curative instruction; and (5) the strength of the evidence supporting the conviction. *Id.*

In *State v. Tyler*, 301 Neb. 365, 377-78, 918 N.W.2d 306, 317 (2018), the Nebraska Supreme Court stated:

> A prosecutor must base his or her argument on the evidence introduced at trial rather than on matters not in evidence. However, a prosecutor is entitled to draw inferences from the evidence in presenting his or her case, and such inferences generally do not amount to prosecutorial misconduct. As we stated in *State v. Dubray*: "[W]hen a prosecutor's comments rest on reasonably drawn inferences from the evidence, he or she is permitted to present a spirited summation that a defense theory is illogical or unsupported by the evidence and to highlight the relative believability of witnesses for the State and the defense. These types of comments are a major purpose of summation, and they are distinguishable from attacking a defense counsel's personal character or stating a personal opinion about the character of a defendant or witness."

Here, Snyder argues that the State utilized evidence in its closing argument that was not properly raised during the trial. More specifically, she argues that despite Mast never testifying that he was terrified or scared, the State, in its closing argument, stated that he was. During the trial, Mast testified that he understood Snyder's statements to mean that she intended to "come out and kill me"; that Snyder sounded "very shooken [sic] and different" than she normally sounded when they spoke on the phone; that he took the threat seriously; and that he contacted law enforcement immediately after it occurred. Based on the evidence presented, the State's closing remarks that Mast took Snyder's threats seriously and was scared and terrified were reasonable inferences. Accordingly, we find no plain error associated with the State's remarks as those inferences did not amount to an improper remark, and therefore, did not constitute prosecutorial misconduct. This assigned error fails.

#### 4. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Snyder assigns that she received ineffective assistance of counsel when her trial counsel failed to object to Rule 404 evidence. Specifically, she contends that trial counsel failed to object

to Mendoza's testimony regarding a Snapchat conversation he had with Snyder that included some "potentially threatening comments that were not a part of the State's primary allegations." Brief for appellant at 15. Snyder argues that had counsel objected to the testimony, the court would have provided a limiting instruction to the jury.

As the Nebraska Supreme Court recently stated in *State v. Rezac*, 318 Neb. 352, 367, 15 N.W.3d 705, 718 (2025):

> When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding.
>
> However, the fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question. The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. Counsel's performance is deficient when it objectively does not equal that of a lawyer with ordinary training and skill in criminal law in the area.

Here, Snyder does not argue that Mendoza's testimony or the text messages received into evidence were inadmissible. Rather, she argues that had counsel made an objection to the evidence, a Rule 404(2) limiting instruction would have been provided by the court. But as we stated before, assuming without deciding that the testimony of Mendoza qualified as evidence admissible under Rule 404(2), it does not follow that the court would have provided a limiting instruction. The court is only required to provide a limiting instruction if requested. And because Snyder does not assign error to counsel's failure to request a limiting instruction and does not argue any legal basis as to why an objection under Rule 404(2) was warranted, we find that the record is sufficient to adequately review this assignment of error on direct appeal and reject it. This allegation of ineffective assistance of counsel is not preserved for postconviction proceedings.

## VI. CONCLUSION

For the reasons stated above, we affirm Snyder's conviction and sentence.

AFFIRMED.